IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT E. WARDEN, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No.  11-2796 |
| | : | |
| PAMELA SENK FALK, et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                                                        **July 27, 2011**

      Plaintiffs Robert E. Warden and ReWarden, Inc. seek a preliminary injunction to prevent Defendants Pamela Senk Falk and Dynamic Housewares, Inc. (DHI) from  (1) commercially using Bob Warden's name, (2) contacting Plaintiffs' business relations with the intent to interfere with Plaintiffs' business, (3) representing or insinuating that Defendants control Bob Warden's name or have the ability to do business under his name, (4) contacting QVC, Inc. television network (QVC) or other companies and asserting Defendants have the right to control Warden's appearances or that Warden is required to seek authorization from Defendants before writing or publishing cookbooks, and (5) engaging in other related activities.

      Also as part of their motion for a preliminary injunction, Plaintiffs seek a declaration that Warden may appear on QVC without Defendants' approval and may introduce himself or be introduced as Bob Warden, and may write and identify himself as the author of new cookbooks. Next, Plaintiffs ask the Court to impose an equitable trust on $770,000 transferred by Falk from the DHI corporate account to her personal bank account, and to appoint a receiver to control DHI's business affairs and coordinate DHI's role in producing a cookbook with Warden.  Plaintiffs further request this receiver be directed to conduct an accounting of DHI to determine all monies diverted to Falk's personal accounts and to determine the amount of funds due to Plaintiffs, if any, under prior contracts or a prior partnership relationship with DHI.  Finally, Plaintiffs ask this Court to cancel

DHI's registration of a "Bob Warden" trademark pursuant to 15 U.S.C. §§ 1064 and 1119. For the reasons that follow, this Court will grant in part and deny in part Plaintiffs' motion for a preliminary injunction.

**PROCEDURAL HISTORY**

Plaintiffs filed this action on April 27, 2011, bringing claims for, *inter alia*, fraudulent trademark registration, trademark infringement, unfair competition, tortious interference, fraud, and breach of contract. Plaintiffs also sought entry of a temporary restraining order (TRO) preventing Falk from interfering with Warden's appearances on and contracts with QVC, a multimedia retailer with which Warden has done business since 1987. Plaintiffs asserted such relief was immediately necessary because Falk informed QVC that she owned the rights to Warden's name, image, and likeness, and that he could not appear on television without her permission.[1] Following an April 27, 2011, conference, this Court denied Plaintiffs' request for a TRO but granted their motion for an expedited preliminary injunction hearing, scheduling the hearing for May 16, 2011. On May 13, 2011, the parties negotiated an interim settlement agreement (ISA) which they believed obviated the need for a preliminary injunction hearing. The parties dictated the terms of their agreement to a court reporter and informed the Court the preliminary injunction hearing was no longer necessary.

Pursuant to the ISA, DHI agreed to work with Plaintiffs to publish a cookbook, "Slow Food Fast II," pursuant to a proposed cookbook contract with QVC. The parties further agreed to "timely

---

[1] Christina Pennypacker, a buyer of foods and cookbooks at QVC, testified Falk told her that Falk had the rights to Warden's name and that Warden could not appear on the air without Falk's permission. Pl.'s Mot. for Prelim. Injunction, Ex. 3. By April 20, 2011, Pennypacker felt QVC was being improperly inserted into the dispute between Warden and Falk, and she told both parties that QVC would suspend future projects with Warden until the issues raised in the instant lawsuit were resolved. *Id.*, Ex. 20.

2

execute any additional documents and undertake any additional action necessary to effectuate the terms contained [within the ISA]." ISA Tr. ¶ 17, May 13, 2011. Plaintiffs' counsel forwarded a copy of the ISA to QVC's counsel, Nathaniel Metz, and asked Metz to advise what additional terms, if any, should be added to satisfy QVC and enable the parties to proceed with production of Slow Food Fast II. Metz edited the draft settlement agreement to include a provision granting QVC an irrevocable license to use Bob Warden's name.[2] Defendants objected to the irrevocable license provision, fearing such a license would dilute their claims to ownership of a Bob Warden trademark, and refused to agree to QVC's proposed additional language.

Having again reached an impasse with Defendants, and fearing they would be unable to produce Slow Food Fast II in advance of an August 25, 2011, deadline, Plaintiffs sought this Court's intervention, asking this Court to enforce the ISA. This Court reviewed the ISA's terms and found that although Defendants agreed to timely execute "any additional documents" necessary to effectuate the ISA's terms, Defendants could not have reasonably anticipated that such additional documents would include the irrevocable license requested by QVC. Because this term of the ISA was not sufficiently definite to be enforceable against Defendants, this Court set aside the ISA and scheduled a preliminary injunction hearing for July 13, 2011. The hearing was held on July 13-15, 2011.

---

[2] Although an irrevocable license provision is standard in QVC purchase orders, the irrevocable license language Metz suggested to the parties was broader than the standard QVC language because Metz wanted to adequately protect QVC's multi-million dollar investment in Slow Foods Fast II from future claims by Falk that she owned the rights to Warden's name and image. Because Falk had previously made such claims, Metz believed inclusion of a broader irrevocable license clause was warranted.

**FACTS**[3]

This case arises from the simultaneous dissolution of the business and romantic relationships between Warden and Falk. Warden is a television personality who has appeared on QVC since 1987 to sell cookbooks and cookware. In 2005, Warden met Falk and the two began an amorous relationship. Sometime thereafter, they decided to go into business together, with Warden providing his talent to the business venture by making appearances on QVC and elsewhere, and Falk handling the business side of the company by reviewing contracts, managing financial accounts, and keeping the company's books. The parties decided to incorporate a business and, to that end, enlisted the services of the law firm K&L Gates to form the new company, DHI. The circumstances surrounding the formation of the company and the final corporate form are hotly disputed. Falk asserts she is the sole owner, officer, and stockholder of DHI, contending Warden did not want to be listed as a company owner because of issues regarding unpaid taxes and his divorce proceedings, which were ongoing in 2006. Warden, in contrast, asserts he is a 50% owner of DHI, arguing he agreed to lend his talent and reputation to the business on the condition that he would receive half of the business's profits. This Court need not make factual findings regarding the ownership of DHI at this time. It is clear, however, that Warden has believed since 2006 that he is a 50% owner of DHI.

In late 2006, the parties also decided to register a "Bob Warden" trademark (the Mark) with the United States Patent and Trademark Office (USPTO), and sought the assistance of another K&L Gates attorney, Christine Redfield, to complete the trademark registration application. The parties agreed that DHI would register the Mark, but they dispute the extent of DHI's legal interest in the

---

[3] In seeking a preliminary injunction, Plaintiffs primarily argue that Defendants should be enjoined from asserting they own a trademark of Bob Warden's name. Accordingly, this Court will briefly review only those facts germane to the issue of trademark ownership.

registration.  Before submitting the application, Redfield advised Warden and Falk that, for DHI to own the Bob Warden name and trademark in connection with cookware, housewares, and cookbooks, Warden would have to "assign all rights, title and interest in his name to [DHI]." Redfield email, Nov. 10, 2006.  She further advised:

> If the application is to be filed in the name of [DHI] based on an oral license agreement from Bob to [DHI], we can go ahead and file the application now. However, if Bob decides to assign his name to [DHI], we should have an assignment agreement executed prior to filing the application.

*Id.*[4]  Falk admits she did not receive an assignment of Warden's rights, title, goodwill, and/or interest in his name before the application was filed, and further concedes she has never received such an assignment.  Instead, Falk testified that Warden refused to execute an assignment.

Nonetheless, three days after sending the email requesting an assignment, on November 13, 2006, Redfield submitted an application for trademark registration on behalf of DHI, which asserted DHI owned the Bob Warden trademark. The November 2006 application asserted that "Bob Warden" had been used as a trademark to promote the goods of others through infomercials, books, and personal appearances since at least December 31, 1986, and that "Bob Warden" had been used to sell cookware, including utensils, electric knives, food processors, electric mixers, other products, and cookbooks since at least December 31, 1993.

On March 31, 2007, the USPTO sent notification of an "Office Action" regarding registration of the Mark.  This notification identified a number of deficiencies in the trademark application, including that the application did not specify whether "Bob Warden" identified a particular living

---

[4] Redfield's November 10, 2006, email also recommended that Warden obtain independent legal advice to determine whether he wished to assign his name to DHI.

individual.[5] The notice further required that, "[i]f the name in the mark identifies a particular living individual," DHI must submit "a signed, written consent from that individual, authorizing applicant to register the name as a trademark with the USPTO." Pl.'s Mot., Ex. 25. Thereafter, DHI obtained a consent form from Warden, dated May 14, 2007, stating "The undersigned Bob Warden, hereby consents to the use and registration as a trademark in the U.S. Patent and Trademark Office of his name by Dynamic Housewares, Inc." Pl.'s Mot., Ex. 31. Warden received no consideration from DHI for signing this consent form. Instead, Warden testified that, because he believed he was a 50% owner of DHI, the company to which he granted use and registration of his name, he believed he was "consenting to himself."

After DHI submitted its responses to the March 31 USPTO office action, the USPTO sent a further notification of office action again refusing registration of the "Bob Warden" trademark because it identified only a writer's name or pseudonym and did not function as a trademark. Pl.'s Mot., Ex. 14. Following DHI's submission of additional materials, the USPTO approved registration of the Bob Warden trademark, effective June 9, 2009. Pl.'s Mot., Ex. 27.

On June 23, 2011, approximately two months after he filed his Complaint in this case, Warden's counsel sent a letter to Falk, stating

> In addition to the Complaint filed in Federal Court in the Eastern District of

---

[5] The notice also informed DHI that registration of the Bob Warden trademark was refused because the mark "identifies only the name or pseudonym of the author of a written work; it does not function as a trademark to identify and distinguish applicant's goods from those of others and to indicate their source." Pl.'s Mot., Ex. 25. In response to this identified deficiency, Defendants submitted additional materials, including copies of the covers and title pages of two of Warden's cookbooks. Plaintiffs assert these documents were fraudulently altered and/or submitted to the USPTO fraudulently. Although the accuracy of these submissions may be an issue at summary judgment or trial, this Court need not address at this juncture whether DHI's subsequent filings were fraudulent.

> Pennsylvania, this letter is formal notice that I hereby revoke the Consent dated May 14, 2007, to the use and registration of my name[,] Bob Warden[,] as a trademark in the United States Patent and Trademark Office.
>
> . . .
>
> This letter is also formal notice that I hereby revoke any and all licenses that I may have granted to [DHI] or to you personally, for the use of my name BOB WARDEN, or the trademark BOB WARDEN, in connection with the sale or distribution of any goods or services, whether oral, in writing, or implied by my ownership in, association with and/or by working with you and/or with Dynamic Housewares, Inc. Please be advised that [DHI] no longer has the right to use my name, or the trademark BOB WARDEN.

Pl.'s Mot., Ex. 28.  Plaintiffs now ask this Court to declare they are likely to succeed at trial on the issue of trademark ownership, and accordingly to enter a preliminary injunction preventing Defendants from asserting ownership of the Bob Warden trademark and from contacting Warden's business contacts or others and representing that Defendants own the rights to Warden's name.

**DISCUSSION**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *PB Brands, LLC v. Patel Shah Indian Grocery PB Brands*, 331 F. App'x 975, 978 (3d Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008)).

Plaintiffs allege Defendants are liable for, *inter alia*, trademark infringement, unfair competition, and fraud, and seek monetary damages, cancelation of the Bob Warden trademark, and injunctive relief.  Plaintiffs assert DHI has no legitimate claim of legal ownership claim to the Mark, and argue the Mark can be canceled pursuant to 15 U.S.C. §§ 1064 and 1119.  Section 119 provides that, "[i]n any action involving a registered mark the court may determine the right to registration,

[or] order the cancelation of registrations, in whole or in part." 15 U.S.C. § 1119; *see also Ditri v. Coldwell Banker Residential Affiliates*, 954 F.2d 869, 873 (3d Cir. 1992) (explaining § 1119 gives federal courts concurrent authority with the USPTO to cancel a registered mark when the validity of the mark is challenged in a judicial proceeding). Section 1064 provides that a petition to cancel the registration of a mark may be filed by any person who believes that he will be damaged by the registration of the mark, and specifies when the petition must be filed. 15 U.S.C. § 1064. A petition to cancel the registration of a mark may be filed within five years from the date of the registration of the mark.[6] *Id.*

Plaintiffs assert this Court should cancel DHI's registration of the Mark because (1) DHI is not and has never been the lawful owner of the Mark; (2) DHI committed fraud in filing the trademark registration application; (3) DHI's continued use of the Mark will result in confusion in the marketplace; (4) DHI's use of the mark will improperly suggest to consumers that DHI has a connection with Bob Warden when such connection no longer exists; and (5) Bob Warden is engaged in fair use of the Mark. To show cancelation of the Mark is warranted, Plaintiffs must show Defendants do not have legal ownership of the trademark. To prevail on their claim Defendants are liable for trademark infringement, Plaintiffs must establish (1) the Mark is valid, (2) they own the Mark, and (3) use of the Mark by Defendants is likely to confuse the public. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

---

[6] When five years have passed after the registration date, a cancelation petition may only be filed in certain circumstances. Neither party disputes that the Mark was registered less than five years ago, and the Mark has therefore not become "incontestable." *See* 15 U.S.C. § 1065 (explaining a mark becomes incontestable after it has been registered and in continuous use for five consecutive years, and if, at the time of incontestability, there are no pending proceedings or adverse decisions concerning the owner's ownership or right to registration).

To determine legal ownership of the Mark, it is necessary to examine the circumstances surrounding registration of the Bob Warden trademark. In order to register a trademark, the mark which is the subject of the application must already operate as a trademark insofar as the public must recognize that a certain quality of goods and services are associated with the mark. *See Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 979 (3d Cir. 1993) (explaining "a term is protectable as a trademark only if the public recognizes it as identifying the [trademark owner's] goods or services and distinguishing them from those of others" (citations and internal quotation marks omitted)). The Lanham Act permits registration of a personal name as a trademark when such name has acquired secondary meaning. *Tillery v. Leonard & Sciolla, LLP*, 437 F. Supp. 2d 312, 320-21 (E.D. Pa. 2006). A personal name acquires secondary meaning when "the public has come to recognize the personal name as a symbol that identifies and distinguishes the goods or services of only one seller." J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 13:28 (4th ed. 2011) (hereinafter *McCarthy*). Trademark rights are acquired and maintained through priority of use, not through registration with the USPTO. *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146-47 (2d Cir. 2007) (explaining that registration of a trademark "shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect . . . against any other person except for a person whose mark has not been abandoned and who, prior to [registration] . . . has used the mark" (citing 15 U.S.C. § 1057(c)); *see also Basile, S.P.A. v. Basile*, 899 F.2d 35, 37 n.1 (D.C. Cir. 1990) ("Although [trademark] registration is a predicate to [trademark] protection under the Lanham Act, the underlying right depends not on registration but rather on use.").

When DHI attempted to register the Bob Warden trademark in 2006, the trademark registration application asserted that the Bob Warden trademark, as it applied to "[p]romoting the

9

goods of others through infomercials, books, and personal appearances," had existed since at least 1986, and that the Bob Warden trademark, as it applied to cookbooks and cookware, had been in existence since 1993.  Additionally, at the hearing regarding Plaintiffs' motion to enforce the ISA, Metz testified that Warden had done business with QVC since the late 1980s and early 1990s, and had an established relationship with the retailer.  At the preliminary injunction hearing, Defendants conceded that Falk did not meet Warden until 2005, and that DHI was not created or incorporated until 2006.  Thus, at the time the trademark application was filed, the secondary meaning associated with the Bob Warden name had been developed solely by Warden through his collaborations with QVC and sale of his cookbooks and cookware products for the previous 18 years.

Similarly, Warden used his name in business for nearly 18 years before DHI was incorporated.  Through his efforts and television appearances since 1987, Warden achieved consumer recognition of his name, and created goodwill associated with his name sufficient to apply for registration of his trademark in 2006.  Therefore, prior to DHI's registration attempt, Warden, not DHI, acquired legal rights to the Bob Warden name as a trademark through his use of his name in interstate commerce and through his career as a cookbook and cookware salesman.  Moreover, because DHI indisputably did not own the mark before 2006, DHI must show it otherwise lawfully acquired the ownership rights to the Bob Warden trademark to prevail.

DHI  thus can only claim ownership of the Mark if Warden assigned DHI the rights to his name. *See Beauty Time, Inc. v. Beauty Makers, Inc.*, 118 F.3d 140, 150 (3d Cir. 1997) (explaining effective assignment of the rights to a trademark is a prerequisite to ownership rights in the trademark); *see also Premier Dental Prods. Co. v. Darby Dental Supply Co., Inc.*, 794 F.2d 850, 853 (3d Cir. 1986) (explaining that because a trademark is only a symbol of "the public's confidence or

'goodwill' in a particular product," a trademark has no significance independent of the established goodwill). In addition to receiving an assignment of the rights in Warden's name, DHI also must have received from Warden the goodwill associated with his name and business for such assignment to be valid. *See id.* (stating a trademark assignment "represent[s] the transfer of goodwill connected with a particular business . . . and [a trademark] cannot be transferred separately from the goodwill of the business"). The assignment of a trademark without a concurrent assignment of the goodwill associated with it is considered an "assignment in gross," and is invalid. *See Beauty Time, Inc.*, 118 F.3d at 150 (explaining that where a trademark was not acquired in connection with the sale of a business or otherwise transferred with the goodwill associated with the trademark, an oral assignment constituted an invalid assignment in gross).

Falk concedes neither she nor DHI ever received an assignment from Warden of the Mark, the assets associated with his trademark, or the goodwill established through his use of his name. Indeed, Falk testified she asked Warden to execute an assignment and he refused.[7] Moreover, Falk admits Warden received no compensation for granting DHI his consent to use and register his

---

[7] This Court can also infer that such an assignment was never obtained based on Redfield's November 10, 2006, email. In the email, Redfield wrote,

> If the application is to be filed in the name of [DHI] based on an oral license agreement from Bob to [DHI], we can go ahead and file the application now. However, if Bob decides to assign his name to [DHI], we should have an assignment agreement executed prior to filing the application.

The trademark registration application was filed three days later, and Redfield testified she did not recall obtaining an assignment of Warden's name on behalf of DHI. Accordingly, it is a reasonable inference that such an assignment was not obtained.

trademark.[8]

Having conceded they received no actual assignment from Warden, Defendants instead assert the consent form signed by Warden operates as an assignment of Warden's rights to and ownership of his trademark. Although "[a]n assignment in writing is not necessary to transfer common law rights in a trademark," *McCarthy* § 18.4, an act which a party asserts is an implied agreement to transfer trademark rights will be construed as an assignment only if the "conduct manifest[s] agreement" to transfer the rights. *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997) (explaining the requirement of "strong evidence" to establish an assignment encourages parties to expressly identify their ownership interest in trademarks and prevents a party "from using self-serving testimony to gain ownership of trademarks"). There is no strong evidence of intent to create an assignment here. Rather, Falk testified that, when DHI requested an assignment of Warden's rights to the Mark, Warden refused. Moreover, the plain language of the consent form does not purport to transfer ownership rights, title, or the trademark's goodwill to DHI; it is merely consent to DHI's "use and registration as a trademark" of the Bob Warden name. Pl.'s Mot., Ex. 31.

Granting consent to use a trademark instead of transferring ownership in a mark is inconsistent with an assignment of rights and title, and is akin to a license. Moreover, DHI's acceptance of the right to use Warden's name, on its own, is a tacit acknowledgment that DHI did

---

[8] These circumstances differentiate this case from those cases where a person has sold his business and his personal name as a trademark to a third party, and then attempts to use his name again. *See, e.g., Levitt Corp. v. Levitt*, 593 F.2d 463 (2d Cir. 1979) (explaining courts are less likely to interfere with a third party's use of its purchased trademark when the seller previously sold his business, including use of his name and its goodwill, to the third party); *Lazzaroni USA Corp. v. Steiner Foods*, No. 05-4476, 2006 U.S. Dist. LEXIS 20962 (D.N. J. Apr. 10, 2006) (granting a preliminary injunction in favor of a third party buyer, where the defendant had previously sold the use of his name to the buyer and later began using his name in association with a competing company).

not own the trademark at the time Warden signed such consent. *See A & L Labs., Inc. v. Bou-Matic LLC*, 429 F.3d 775 (8th Cir. 2005) (explaining that, "if [the licensee] had owned the trademarks, it would not have needed [the trademark owner's] permission to use them"); *Hot Stuff Foods, LLC v. Mean Gene's Enters., Inc.*, 468 F. Supp. 2d 1078, 1095 (D.S.D. 2006) (explaining the existence of a party's license to use a trademark indicates the party does not own the licensed mark).

Based on the evidence submitted to the Court at the preliminary injunction hearing, Plaintiffs have made a strong showing that DHI does not own the Bob Warden trademark because Warden developed the trademark himself, and never assigned rights in the trademark to DHI.[9] Although this is not a definitive finding that cancelation of the Bob Warden trademark is appropriate, given the evidence introduced so far, this Court believes Plaintiffs have a likelihood of success on the merits of their claim that Defendants do not own the Mark.[10]

The other preliminary injunction factors also favor granting Plaintiffs' request to enjoin Defendants from using Bob Warden's name commercially, and from making contact with Plaintiffs' business relations, and representing or insinuating that they have the right to control Warden's use of his name, or that prior authorization must be sought from Defendants before Warden may appear on television or author cookbooks under his name. Without such an order, Warden will suffer irreparable harm. Both Metz and Warden testified that Falk had created confusion over the

---

[9] Plaintiffs assert that this finding is enough for this Court to order cancelation of DHI's Bob Warden trademark. This Court, however, believes the balance of the equities favors postponement of this decision until Defendants have had an opportunity to complete discovery and respond to summary judgment motions on this issue. Such postponement will not unduly prejudice Plaintiffs because the deadlines for discovery and dispositive motions are within the next two months.

[10] Because Plaintiffs have shown they are likely to succeed on the trademark ownership issue, this Court need not address Plaintiffs' remaining arguments for cancelation of the trademark, including Defendants' fraud and the likelihood of confusion in the marketplace.

trademark by asserting Warden could not do business with QVC without her permission. Her assertions caused QVC to suspend production of Slow Food Fast II, a lucrative project which was planned as a sequel to Warden's highly successful first slow-cooker recipe book. If DHI is not enjoined from asserting ownership of Warden's name, Warden risks the dilution or destruction of the strength of the goodwill associated with his name–goodwill which he has spent years developing. *See id.* ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."); *see also Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990) (holding a trademark owner's loss of control of his mark "creates the *potential* for damage to reputation . . . [which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case"); *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988) ("[T]he most corrosive and irreparable harm attributable to a trademark infringement is the inability of the victim to control the nature and the quality of [the infringer's] goods."). Warden further testified that companies with which he plans to do business in the future have become unresponsive to him after being subpoenaed or contacted by Falk, and the value of these lost business opportunities is incapable of exact calculation, rendering monetary compensation an inadequate remedy.

Moreover, the balance of the equities tips in Plaintiffs' favor because issuance of a limited injunction will not harm Defendants more than a denial of such injunction would harm Plaintiffs. Although Defendants assert if they are enjoined from asserting their trademark rights, they may lose the trademark through acquiescence to its use by others, the risk of such loss is low because the injunction is limited in time. The injunction shall only remain in place pending the outcome of dispositive motions or a jury's verdict on the trademark ownership issue, and this case is scheduled

for trial on September 12, 2011. Therefore, Defendants will be enjoined from asserting rights to the Bob Warden trademark for less than two months. The possibility of Defendants incurring harm is less than the much more concrete possibility that Plaintiffs, particularly Warden, will be harmed, given Warden's strong interest in using his own name and protecting his reputation.

Finally, the public interest also favors granting a limited injunction. In a trademark case, public interest is "often a synonym for the right of the public not to be deceived or confused." *Opticians*, 920 F.2d at 197 (citing *McCarthy* § 30:21). Because there is a likelihood of consumer confusion if both DHI and Warden use the Bob Warden trademark, the public interest in remaining free of such confusion is best served by enjoining DHI from asserting ownership in the trademark pending resolution of the trademark ownership issue.

With regard to the remainder of Plaintiffs' requested relief, this Court will deny Plaintiffs' request for a declaration that Warden is not restricted from authoring future cookbooks, because such undefined potential future projects are not properly the subject of a preliminary injunction insofar as Plaintiffs have not shown such unplanned projects cannot wait for a full resolution of this case on the merits. This Court will, however, declare that, pending the outcome of this litigation, Warden is not restricted from appearing on QVC and introducing himself or being introduced as Bob Warden, provided that he does not sell any products which are "Bob Warden brand" until the conclusion of this litigation.

This relief is granted in recognition of Warden's right to use his own name and take advantage of his personal reputation and goodwill. *See Societe Vincole De Champagne v. Mumm*, 143 F.2d 240, 241 (2d Cir. 1944) ("To prevent all use of [a person's personal name] is to take away his identity; without it he cannot make known who he is to those who may wish to deal with him;

and that is so grievous an injury that courts will avoid imposing it, if they possibly can."). This remedy is also consistent with the practice of federal courts to permit a person's limited use of his own name, even when another person or company owns the trademark to his name or surname. *See Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir. 1978) (affirming the portion of a preliminary injunction which precluded defendant Walter S. Taylor, the grandson of the founder of Taylor Wine Co., from using the "Taylor" name as a trademark in connection with his new wine company, but holding the injunction was too broad where it prohibited the defendant from using his last name in connection with his company); *Paul Frank Indus., Inc. v. Paul Sunich*, 502 F. Supp. 2d 1094, (C.D. Cal. 2007) (enjoining defendant from using his name in a manner confusingly similar to the "Paul Frank" brand, but permitting defendant to use his name in other commercial contexts to identify himself and inform others about his work); *Cerruti v. Cerruti, Inc.*, No. 95-7782, 1997 U.S. Dist. LEXIS 20860, at *7 (S.D.N.Y. Jan. 5, 1998) (holding an outright ban of defendant's use of his name was "simply too radical a step to take" and permitting defendant to use his name in connection with his business, provided he refrained from using his name as a brand and included a disclaimer that he was not connected with the Italian Cerruti fashion firm); *R.J. Toomey Co. v. Toomey*, 183 F. Supp. 873 (D. Mass. 1988) (permitting defendant Richard Toomey, the son of the founder of R.J. Toomey Co., to use his last name in product labeling and advertising, provided he did not use the Toomey brand or otherwise represent or imply that he was connected with the Toomey company).

    This Court will deny Plaintiffs' other remaining requests for relief, including their request for imposition of a constructive trust and for appointment of a receiver to control DHI. Under

Pennsylvania law,[11] imposition of a constructive trust is appropriate "where a person who holds title to a property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Roberson v. Davis*, 580 A.2d 39, 41 (Pa. Super. Ct. 1990) (citation omitted). "One who seeks to construct a trust bears a heavy burden of proof; the evidence must be clear, direct, precise and convincing." *Id.* (citation omitted). Although Plaintiffs assert a constructive trust should be imposed over $770,000 Falk transferred from DHI into her personal bank account, arguing Warden is entitled to half of such funds as a co-owner of DHI, Plaintiffs have failed to show "clear, direct, precise and convincing" evidence that they are entitled to those funds. Plaintiffs have produced evidence showing Warden's belief that he was a 50% owner in DHI, but have produced no documents or other evidence clearly showing Warden enjoyed such an ownership interest.[12] Therefore, they have failed to meet their burden for imposition of a constructive trust.

Because Plaintiffs have not yet presented clear evidence that Warden has an ownership interest in DHI, this Court also will not appoint a receiver. Appointment of a receiver is an extraordinary remedy which should be awarded only when the party requesting receivership has shown "fraud or imminent danger of property being lost, injured, diminished in value, or squandered and where legal remedies . . . appear to be inadequate." *Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 826 (3d Cir. 1959); *see also Berger v. Weinstein*, No. 07-994, 2008 WL 191172, at * 12 (E.D. Pa. Jan. 23, 2008) ("[T]he appointment of a receiver is an extraordinary remedy, and ought never be

---

[11] The parties agree that Pennsylvania law applies to their claims and counterclaims.

[12] This Court makes no finding regarding the ownership of DHI, and given the limited evidence presented regarding this issue, denial of a constructive trust should not be construed as such a finding.

made except in cases of necessity, and upon a clear and satisfactory showing that an emergency exists" (citations and internal alteration omitted)).  As the appointment of a receiver is an infringement upon the defendant's property rights, a plaintiff seeking a receiver's appointment "must show that he has some 'legally recognized right in the property . . . amounting to more than a mere claim against the defendant.'" *Id.* (internal alterations omitted) (quoting *Mintzer*, 263 F.2d at 825). Because Plaintiffs have failed to make a satisfactory showing that they have a property interest in DHI, their request for appointment of a receiver will also be denied.

An appropriate order follows.

BY THE COURT:

 /s/ Juan R. Sánchez
Juan R. Sánchez, J.